OPINION
This case is best summarized by borrowing a phrase from Congreve's TheMourning Bride, III, 8, "Heav'n has no rage like love to hatred turn'd, Nor hell a fury like a woman scorn'd."
Melody Santos is appealing a judgment of the Dayton Municipal Court convicting her of criminally damaging her ex-boyfriend's garage door. The trial court sentenced Santos to ninety days in jail, a $750 fine, and costs. The jail time and $700 of the fine were suspended, and Santos was placed on three years of probation. As a condition of her probation, she was ordered to pay $2,750 in restitution and perform twenty hours of community service.
The criminal damaging complaint against Santos was filed in the Dayton Municipal Court on January 13, 2000, and a trial was held on March 15, 2000. Evidence was provided by the complainants, David and Susan Cross, who will hereinafter be referred to by their first names for the sake of clarity. David testified that he and Santos had met and had begun dating in 1995. After residing together for a period of two to three years, David informed Santos that he would never marry her. Eventually, Santos moved into one of David's rental properties, and a year later moved out on her own.
At some point thereafter, David began dating Susan and the couple married in February of 1999. In March of 1999, the Crosses experienced a string of hang up phone calls. A tracer was placed on the line which confirmed David's suspicions that Santos had been responsible for the hang up phone calls. The Crosses changed their phone number several times, but each time only a couple of weeks passed before the hang up phone calls resumed. Eventually the Crosses terminated their telephone service.
During this time, Susan received several threatening phone calls. Susan believed the caller was Santos based upon references the caller made to conversations David had had with Santos. Susan, who worked at Chrysler Corporation (hereinafter "Chrysler") with Santos and David, also began experiencing several threatening "writings" at work, including graffiti on the bathroom mirror. Additionally, after Susan moved into David's 1047 Highland Avenue residence with him, a change of address card had been filled out "cancelling" her Highland Avenue address and redirecting her mail to 290 Medford Street, Santos' address.
On October 21 and October 26, 1999, the Crosses noticed that damage had been done to their garage door. In both instances, the couple called the police department and filed a police report. Because no eyewitnesses were available in either instance, law enforcement officials could not do much to pursue a suspect.
Believing that Santos was performing the damaging, on November 2, 1999, the Crosses hired the R. C. Beckett's Detective Agency and purchased $1,438.20 worth of surveillance equipment from ADT Security Systems, including a video camera, a recorder, and a monitor. The camera was situated to continuously tape the Crosses' garage door and a portion of the alley behind the garage door.
On November 9, 1999, Joe Windon, a private investigator for R.C. Beckett's Detective Agency, attempted surveillance of Santos. At 10:45 p.m., Santos left Chrysler and entered a white Chrysler Volare, license plate number AXN 4093. Windon followed Santos but lost sight of her upon stopping at a traffic signal.
The following day, on November 10, 1999, Windon again waited for Santos to leave Chrysler. She exited the building at 10:00 p.m., again entered the white Chrysler, and proceeded out of the parking lot. Windon followed Santos to Highland Avenue and observed her entering the alley behind 1047 Highland Avenue. He did not proceed down the alley, but he observed Santos drive through the alley three times that night.
At approximately 1:30 a.m. on November 11, 1999, the Crosses arrived home to find that their garage door had been damaged significantly. The videotape from the surveillance camera showed footage of a white car ramming the garage door at 10:26 p.m. and again at 10:29 p.m. The driver of the car could not be seen in the video. Upon viewing the videotape at trial, Windon identified the car hitting the garage as Santos' car which he had followed the evening of November 10, 1999.
David and Susan both testified that, between August and November of 1999, they had seen Santos driving a 1978 white Chrysler Volare or Duster with louvers on the back window. David recalled Santos' license number as "4093 AXN." The Crosses identified the white car in the videotape as the car they had seen Santos drive during those preceding months. Susan also stated that she had seen Santos' son, Brian Bush, drive the white car during that time period.
The Crosses replaced their garage door as a result of the damage, and the cost was approximately $500. In addition, the charge for the private investigator was $1,126.00.
Santos testified that she had lived at 290 Medford Street since August of 1999. She explained that she and David had dated but had only lived together while she assisted him in painting his house during one summer. She claims that she broke up with him five times during their relationship. Santos denied calling Susan, denied threatening Susan, denied ownership of the graffiti, and denied having any knowledge of the change of address card. Additionally, Santos denied driving a Volare or a Duster, but stated that her Chevy Caprice, which she had sold to her daughter, had had the license plate number AXN 4093. According to Santos, during the months of October and November of 1999, she had been driving a navy blue Chrysler Labaron. Additionally, Bush testified that neither he nor his mother had ever driven a Volare, and that his license had been suspended for 1999, so he had not driven at all during that year.
The trial judge found Santos guilty of criminal damaging. She was sentenced to ninety days in jail and ordered to pay a $750 fine plus costs. The trial judge suspended all but the costs and $50 of the fine, and placed Santos on three years probation. As a condition of her probation, Santos was ordered to perform twenty hours of community service and to pay $2,750 in restitution to reimburse the Crosses for their expenses.
Santos now appeals the judgment of the trial court, asserting three assignments of error.
 I.
The court errored {sic} in allowing Mr. Cross to testify as to handwriting on the change of address card and various other notes, letters and exhibits being that of Melody Santos.
In her first assignment of error, Santos contends that the trial court erred in admitting the opinion testimony of David regarding the source of the handwriting on the change of address card.
Evidentiary rulings lie within the broad discretion of the trial court and will form a basis for reversal only upon an abuse of discretion amounting to prejudicial error. State v. Graham (1979), 58 Ohio St.2d 350,352, 12 Ohio Op.3d 317, 318. The authentication of a writing must be proven prior to its admission into evidence. Steinle v. Cincinnati
(1944), 142 Ohio St. 550, 27 Ohio Op. 488. Evid.R. 901(B) lists several methods by which a document may be authenticated by extrinsic evidence:
 By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
 (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
 (2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
The party attempting to authenticate handwriting through nonexpert opinion testimony must establish that the nonexpert witness is sufficiently acquainted with the handwriting of the purported author to offer a valid opinion as to its genuineness. Holtz v. Dick (1884),42 Ohio St. 23. A nonexpert may compare a genuine sample of the person's handwriting with the handwriting in question if the nonexpert witness has first-hand knowledge of the purported author's handwriting. Bell v.Brewster (1887), 44 Ohio St. 690.
Turning to the writing on the change of address card, we do not believe that David authenticated the handwriting. David testified that he had suspected that Santos was the author, and that the writing matched that of another letter that had been sent between Santos' residence and the Crosses' home, but that he had not been familiar with Santos' handwriting. In fact, the State noted that it did not "intend to prove that [Santos] in fact did make these writings[.]"
We do note that the writing on the change of address card was not an element of criminal damaging. Moreover, it is clear that the trial court did not rely upon David's opinion in deciding the case:
 Mrs. Barthelemy-Smith: I would object. I believe you do need to be a writing expert to be able to compare. I will object to that statement.
 The Court: Well, overruled. This is just his opinion. It doesn't mean anything. He's not an expert.
(Tr. 19.)
Furthermore, because the State introduced sufficient evidence supporting its theory that Santos damaged the Crosses' garage door aside from the handwriting evidence, we find that any error in admitting the testimony was harmless. See, generally, State v. Cowan (1999),87 Ohio St.3d 68, 79-80.
Accordingly, Santos' first assignment of error is overruled.
 II.
The decision of the trial court, in returning a guilty verdict against Melody Santos, was against the manifest weight and sufficiency of the evidence.
Santos first argues that the sufficiency of the evidence does not support her criminal damaging conviction, specifically, that the State failed to prove the connection between Santos and the harm done to the Crosses' garage door. Because there was no eyewitness, the surveillance camera did not show the occupant of the car, and Windon did not observe the white car hit and do damage to the garage door, Santos argues that there was insufficient evidence to sustain her conviction. We disagree.
Sufficiency of the evidence is a question of law which tests the adequacy of the evidence. State v. Thompkins (1997), 78 Ohio St.3d 380,386. In considering a claim based on sufficiency of the evidence, a reviewing court:
 [E]xamine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
The criminal damaging statute, R.C. 2909.06(A)(1), provides that no person shall knowingly cause a substantial risk of physical harm to any property of another without the other person's consent. After reviewing the record, we conclude that there was sufficient evidence upon which to conclude that all of the elements of criminal damaging under R.C.2909.06(A)(1) had been proven beyond a reasonable doubt.
The record reveals that on November 10, 1999 at approximately 10 p.m., Windon observed Santos leave Chrysler and enter a white Chrysler Volare, license plate number AXN 4093. Windon followed Santos to Highland Avenue and observed her turn down the alley that led to the Crosses' garage. Although Windon did not follow Santos through the alley, he observed Santos drive through the alley three times in a short period of time.
At 10:26 p.m. and 10:29 p.m. on November 10, 1999, the surveillance camera detected a white car deliberately driving into the Crosses' garage door. Windon testified that the white vehicle on the videotape was the same vehicle that he had followed out of the Chrysler parking lot which Santos had driven. At trial, Windon identified Santos as the woman he had observed driving the Volare on November 9th and 10th. Additionally, Susan and David testified that the vehicle on the videotape was the same vehicle that they had seen Santos drive on several occasions during the months prior to the incident.
Santos claims that she could not have been the driver of the white car because Windon had stated that Santos had not left Chrysler on November 10, 1999 until 10:45 p.m. To the contrary, Windon testified that on November 9, 1999, he had watched Santos leave Chrysler at 10:45 p.m., however on November 10, 1999, he had watched Santos leave Chrysler at 10 p.m., thus it was possible that Santos had been the driver of the vehicle.
After reviewing the record and viewing the evidence in a light most favorable to the prosecution, the trial court could have found that the essential elements of criminal damaging were proven beyond a reasonable doubt and therefore Santos' conviction was supported by the sufficiency of the evidence.
In addressing Santos' weight of the evidence challenges, an appellate court:
 [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
Thompkins, supra, at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. While Thompkins explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of this portion of Santos' assignment of error.
Santos argues that her conviction is against the manifest weight of the evidence because the State failed to provide evidence connecting Santos to the criminal damaging incident. Santos further confuses the times and dates of the incident and Windon's surveillance. In this portion of her assignment of error, she argues that, according to the videotape, the incident occurred on November 9, 1999 at 10:29 p.m., and according to his testimony, Windon had observed Santos leave Chrysler at 10:45 p.m. that same night, and therefore, temporally, Santos could not have damaged the Crosses' garage. As we explained before, the record reveals that on November 9, 1999, Windon watched Santos exit Chrysler at 10:45 p.m. The next evening Windon watched Santos leave Chrysler at 10 p.m., and the videotape captured the white vehicle ramming into the Crosses' garage door at 10:26 p.m. and 10:29 p.m. We can conclude from the times and the dates of the events that it was feasible for Santos to have damaged the Crosses' garage.
Furthermore, we see no merit in Santos' theory that her conviction was against the manifest weight of the evidence because no eyewitness had seen her damage the garage door and the surveillance camera had failed to show that Santos was the occupant of the car. As observed in Jenks,supra, at 272, "circumstantial evidence and direct evidence inherently possess the same probative value," and the circumstantial evidence in this case is overwhelming. Santos left her place of employment at 10 p.m. on November 10, 1999. Windon observed Santos enter a white Chrysler Volare. Windon followed Santos to Highland Avenue and observed her enter and proceed through the alley behind the Crosses' home, where the entrance to their garage was located. The videotape captured the image of the same white vehicle that Windon had followed, and that David and Susan had seen Santos drive in the preceding months, drive purposefully into the Crosses' garage two times. Windon testified that the license plate number of the white vehicle was AXN 4093, a number that Santos admitted belonged to one of her cars. Based upon this evidence, we cannot find that the trial court lost its way and that a manifest miscarriage of justice had been created such that Santos' conviction should be reversed and a new trial ordered.
Accordingly, we overrule Santos' second assignment of error.
 III.
The trial court abused its discretion in ordering Melody Santos to repay Mr. Mrs. Cross the cost of the camera equipment and costs of the private detective (app. $2,250) as a condition of her probation.
In her final assignment of error, Santos argues that the trial court violated R.C. 2929.21(C) by ordering her to pay restitution in an amount exceeding the property damage to the garage door. The State contends that Santos waived this issue on appeal because of her failure to object to the trial court's order. A review of the record demonstrates that Santos did fail to object to the trial court's decision; however, this court has recognized restitution-based sentencing errors under the plain error doctrine. State v. Clark (June 19, 1998), Greene App. No. 97 CA 26, unreported, citing City of Xenia v. Smith (June 30, 1995), Greene App. No. 94-CA-110, unreported (noting that "[i]f the restitution order is not valid, clearly the outcome of the trial as far as restitution would have been otherwise, and we therefore must consider it as plain error").
R.C. 2929.21(E) governs a trial court's authority to order restitution in misdemeanor cases:
 The court may require a person who is convicted of or pleads guilty to a misdemeanor to make restitution for all or part of the property damage that is caused by the offense * * * that the person committed.
Where restitution is ordered not as a part of a defendant's sentence, but as a condition of probation, restitution for other damages is authorized by R.C. 2951.02(C). State v. Shenefield (1997),122 Ohio App.3d 475 (trial court had authority to order defendant to pay victim's medical expenses as a condition of probation); State v. Bush
(1992), 83 Ohio App.3d 717 (trial court's order for defendant convicted of sexual assault to pay for victim's psychological counseling was valid); State v. Henry (Feb. 13, 1992), Cuyahoga App. No. 59837, unreported (restitution for medical and psychological damages as a part of defendant's probation was a valid order).
When placing a defendant on probation, R.C. 2951.02(B)(9) permits a trial court to consider whether "[t]he offender has made or will make restitution or reparation to the victim of the offender's offense for the injury, damage or loss sustained." R.C. 2951.02(C) establishes the minimum conditions that apply when the trial court determines whether to place an offender on probation, and also gives the trial court the authority to impose additional requirements upon the offender which are in the interests of doing justice, rehabilitating the offender and ensuring her good behavior. See, also, Henry, supra.
As stated by the court in State v. Schrickel (Sept. 19, 1997), Wood App. No. WD-96-060, unreported,
 The authority of a trial court to order restitution, reparation and compensation to a victim as a condition of probation should be analyzed by applying both R.C. 2951.02(B)(9) and R.C. 2951.02(C). As long as the amount ordered to be paid by the defendant is a condition of probation and is reasonably related to the offense for which the offender has been placed on probation, the trial court has the authority under R.C. 2951.02
to place conditions of probation upon the offender which will permit compensation to the victim for the "injury, damage, or loss sustained."
Santos' reliance on R.C. 2929.21(E) is unpersuasive as she was not ordered to pay restitution as a part of her sentence, but as a condition of probation. See, Bush, supra; State v. Mastronardi (June 30, 2000), Erie App. No. E-99-050, unreported; State v. Jocelyn B. (Aug. 8, 1997), Erie App. No. E-96-010, unreported. We find that, under R.C. 2951.02(B)(2) and (C), the trial court had the authority to order Santos to pay $2,750 in restitution as a condition of her probation. While the majority of the cases we have noted authorize trial courts to order a defendant to pay medical expenses as a condition of probation, we find the same reasoning applies to this case. The amount of restitution was appropriate, as it was to compensate the Crosses for the financial loss they had suffered to determine who had been damaging their property and to prevent any further damage. Santos did damage their garage. We find the Crosses' expenses were reasonably related to Santos' conviction of damaging the Crosses' garage door. Because the restitution is valid and the outcome of trial, as far as restitution, would not have been different, the trial court did not commit plain error. Accordingly, Santos' final assignment of error is overruled.
Judgment of the trial court is affirmed.
WOLFF, P.J. and BROGAN, J., concur.